Filed 8/1/14  P. v. Rodriguez and Lopez CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>RODOLFO MIGUEL RODRIGUEZ and NOLAN LOPEZ,<br><br>    Defendants and Appellants. | G049804<br><br>(Super. Ct. No. FWV903084)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of San Bernardino County, Stephan G. Saleson, Judge.  Affirmed as modified, and remanded with directions.

Waldemar D. Halka, under appointment by the Court of Appeal, for Defendant and Appellant Rodolfo Miguel Rodriguez.

Jerome P. Wallingford, under appointment by the Court of Appeal, for Defendant and Appellant Nolan Lopez.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Kristine A. Gutierrez and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

A jury convicted Rodolfo Miguel Rodriguez and Nolan Lopez of first degree murder on a felony murder theory (Pen. Code, § 187, subd. (a); all further statutory references are to this code) for slaying Rafael Ochoa. The jury also convicted defendants of carjacking (§ 215, subd. (a)) and robbery (§ 211), and found Rodriguez guilty of being a felon in possession of a firearm (§ 12021, subd. (a)(1)). The jury found allegations of special circumstances on the murder count to be true for murder committed during a robbery and carjacking (§§ 190.2, subd. (a)(17)(A) & (L)), and also found true numerous firearm allegations concerning Rodriguez, including that he personally used a firearm (§ 12022.53, subd. (b)), personally and intentionally discharged a firearm (§ 12022.53, subd. (c)) causing great bodily injury or death (§ 12022.53, subd. (d)), and as to both defendants that a principal personally used a firearm (§ 12022.53, subd. (e)(1)). The jury acquitted defendants of premeditated first degree murder and a gang penalty enhancement (§ 186.22, subd. (b)(1)) and a gang special circumstance allegation (§ 190.2, subd. (a)(22)). The trial court sentenced Rodriguez to life in prison without the possibility of parole (LWOP) plus 44 years, and sentenced Lopez to an LWOP term plus 10 years.

Defendants raise a host of issues on appeal.[1] They contend the prosecutor failed to disclose contact information for a potentially material witness, the trial court erroneously authorized admission of Ochoa's last words as a dying declaration or spontaneous utterance, failed to redact or exclude a witness's police statement that referenced uncharged prior carjackings defendants may have committed, and Lopez argues the court erred in failing to dismiss the gang allegations against him. Defendants

---

[1] Lopez joins in each of Rodriguez's appellate contentions, and Rodriguez does the same for each of Lopez's arguments. For ease of reference, we discuss each argument in the body of the opinion as raised by the respective defendant, but our resolution of each contention applies equally to both defendants.

2

contend the trial court's accomplice instructions were inadequate, they insist conspiracy is not a valid theory of vicarious liability, and they challenge their conviction and LWOP sentences for felony murder. Lopez argues the trial court erred in denying his motion under *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*) and his subsequent motion under *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*) to represent himself in a new trial motion. As we explain, defendants' petty theft convictions must be set aside as lesser included offenses of robbery, their convictions for robbery and carjacking (and attendant firearm enhancements) must be stayed under section 654, and a limited remand is required for the trial court to award restitution for Ochoa's funeral expenses to his nearest relatives instead of an insurance company. But apart from these corrections, the judgment is affirmed.

I

FACTUAL AND PROCEDURAL BACKGROUND

A. *The Murder*

Ochoa owned his own trucking company and drove a Freightliner tractor-trailer. He regularly carried cash of around $300 to $500 for fuel. He did not own a handgun, and while he used a rifle when he went hunting, he kept neither guns nor ammunition in his truck. Ochoa kept his truck very neat, and he would never let anyone borrow it, even for a fee, nor did he pick up hitchhikers.

On December 15, 2009, Ochoa drove from his home in Tulare County to deliver frozen juice to a business in Ontario. While en route, he spoke on his cell phone around 4:00 p.m. with his friend Maricela Martinez, who arranged to meet him at the Truck Stop of America (TA truck stop) in Ontario. He asked Martinez to bring him a gallon of milk, fruit, and cookies because he had used all his money for gas. He also

3

spoke on his cell phone to his adult son Alejandro, who found Ochoa happy and eager to arrive at his destination for the evening. Ochoa met Martinez at the truck stop, they had dinner nearby, and returned to the truck stop, where Ochoa told Martinez he was tired and would look for a parking place to sleep for the evening. Martinez departed, but called Ochoa a half hour later; he told Martinez he parked across the street from where she had dropped him off, and asked her to call him at 6:00 a.m. to wake him up. She agreed and said she would bring him breakfast.

Around 11:30 p.m. that night, Connie Lambert and her husband Steven left the TA truck stop in their tractor-trailer, headed towards Interstate 10 west. Steven saw Ochoa's truck turn left from an intersection near the TA truck stop onto the Interstate 10 onramp. Steven and Connie headed in the same direction and after a short period of time, Ochoa's truck lurched to the left, onto the road berm. The driver corrected course, but then the truck careened off the right side of the road, down into a ditch where it hit a cement culvert, turned on its side, and came to rest against the wall adjoining a CarMax car lot.

Ochoa climbed out of the driver's side of his truck. He hung on to the door with one arm, fell to the ground, and stumbled down the culvert. He then crawled out of the ditch and under the Lamberts' trailer, where they had parked by the side of the road. Connie noticed Ochoa was covered in blood and had a gunshot wound in his upper chest above his heart. Connie exited her truck cab to aid Ochoa and Steven dialed 911. As Connie assisted Ochoa, Ochoa told her he was robbed. Connie saw two dark-skinned men wearing hoodies and long shorts exit Ochoa's truck through the driver's side door. They jumped over the fence surrounding the CarMax car lot and ran away.

Mario Miranda, a truck driver fluent in English and Spanish, saw the crash and stopped to help, where he found Ochoa surrounded by other truck drivers. Ochoa's body and clothing were covered in blood, he was in "[p]oor shape," and clearly in agonizing pain. Ochoa did not respond when Miranda spoke to him in English, but nodded that he spoke Spanish, and when Miranda asked what had happened, Ochoa answered, "Mi robaton, mi tiraron valasos," which means, "I got robbed and I was shot." Ochoa used the plural, meaning more than one person robbed and shot him.

Police and medical personnel arrived quickly. Ontario Police Officer Justin Vanduyne saw Ochoa lying on the asphalt near the freeway, being loaded onto a gurney. Vanduyne followed the ambulance to the Arrowhead Regional Medical Center. About 10 minutes into the trip, Vanduyne observed that Ochoa required chest compressions. At 12:22 a.m. on December 16, the emergency room doctor pronounced Ochoa dead. After the coroner processed the body, Vanduyne could see that Ochoa suffered several gunshot wounds. Ochoa did not have his wallet or cell phone.

B.     *The Police Investigation*

Shortly after the crash, Kristina Pullen, a California Highway Patrol Officer responded to the scene and received a dispatch that two suspects were seen fleeing on foot through the CarMax parking lot. Finding nothing at the location, Pullen continued in her vehicle until she noticed a pedestrian matching the suspects' description. Pullen exited her vehicle with her weapon drawn, ordered Rodriguez to stop, and detained him without incident.

Rodriguez explained his friends dropped him off there. Specks of blood dotted his face and there was a blood smear on his left hand. Pullen's partner asked Rodriguez if he was okay, but Rodriguez responded, "I don't know what you're talking

5

about." Ontario police officers arrived and also noticed blood specks on Rodriguez's face, his shorts, and his socks. A forensic specialist came to take photos, but Rodriguez kept wiping his face on his shirt and bending over to wipe his face on his shorts. He continued to wipe his face despite numerous commands to stop, until an officer grabbed his shirt to hold him still. He tried to prevent the forensic officer from swabbing his hands for gunshot residue by continually moving around, wiping his hands on his shirt, and complaining his stomach hurt. Rodriguez did not appear to be under the influence of alcohol or narcotics. He did not possess any drug paraphernalia, but the officers found him with Ochoa's cell phone.

Meanwhile, Ontario Police Officer James Mikkelsen and his canine, Rex, searched along Inland Empire Boulevard, to the north of the CarMax lot. Around 3:00 a.m., Rex found Lopez was hiding in the bushes, where Lopez ignored Mikkelsen's order to show his hands and Lopez also refused to put his hands behind his back. Another officer handcuffed Lopez, patted him down for weapons, and removed items from his pockets, including brass knuckles, $363 in cash, and a gold ring with a horse emblem and a Freightliner keychain belonging to Ochoa. Lopez did not appear to be under the influence of narcotics.

Ochoa's autopsy revealed he suffered three gunshots and all three bullets transected his body, including a gunshot wound on his rear, upper right shoulder. The bullet traveled from the back of his body to the front, right to left, and exited at the bottom of his neck. The medical examiner found another bullet entry wound, with soot, on the upper left side of his back. The soot meant the shot was fired from close range, within a foot and probably within a few inches; the bullet traveled back to front, left to

6

right, and slightly upwards. Another bullet pierced Ochoa's left leg and exited the sole of his foot.

Ochoa suffered bruises on his face, caused by a blunt object. There were bruises and abrasions on his arms, and bruises on his shoulders, torso, legs, and shins. Ochoa also had a patterned injury around the bottom of his rib cage which contained three parallel marks, caused by impact with a blunt object and consistent with Lopez's brass knuckles. The medical examiner concluded Ochoa's injuries were more consistent with a physical assault than in a vehicle crash.

The medical examiner identified the upper body gunshot wounds as the cause of death. Both upper body bullet strikes caused internal injuries and bleeding, one piercing Ochoa's right lung and the other his spleen, liver, and pancreas. A person with such injuries could remain conscious up to a few minutes, and might be able to talk. However, he would feel the effects immediately and would understand he was grievously wounded.

The police investigation showed several calls from Ochoa's cell phone after the crash, beginning at 11:43 p.m. and repeating every 10 or 15 minutes. Most of the calls went to a phone in the location where Lopez was hiding, and others went to a number with a Los Angeles area code. Detectives also recovered surveillance footage from the CarMax location, which depicted Rodriguez removing items from his waistband and throwing them over a wall. Officers found by the wall a Ruger nine-millimeter semi-automatic handgun, a gun magazine, and three live rounds of nine-millimeter ammunition. Small amounts of blood smeared the left side of the gun's slide. The officers also found Ochoa's wallet on the ground where Rodriguez had attempted to throw it over the wall.

Detectives recovered several bullets in or near Ochoa's truck cab, and forensic analysis showed they had been fired by Rodriguez's Ruger. Detectives found in the truck cab a bullet hole in the console; the position of the hole indicated the shot had come from behind the driver towards the console, and another bullet strike and bullet fragments by the gas pedal marked a shot traveling from the rear of the cab to the front. Another shot pierced the top part of the cab to the left of the driver's seat at a 30 to 45 degree angle. The cab was in disarray and blood stained the driver's seat.

When a forensic specialist collected blood speck samples and DNA swabs from Rodriguez's cheek, he had no visible injuries. The size of the blood specks suggested high impact blood spatter. Lopez had a couple of scratches on the right side of his face when he was arrested and blood on his clothing, but no injuries to account for the blood. Lopez, Rodriguez, and Ochoa each had gunshot residue particles on their hands. A criminalist explained at trial that about 50 percent of gunshot victims are found with traces of gunshot residue, which may be deposited when a person fires a gun and the victim is within 12 feet of a gun when it discharges or the victim touches a surface containing gunshot residue.

DNA analysis showed Rodriguez was a possible major contributor to a swab from the right grip of the nine-millimeter handgun. There were two undetermined minor contributors. As to the left grip of the handgun, Ochoa and Lopez were possible major contributors and Rodriguez a possible minor contributor. Lopez was a possible major contributor to a swab on the right side of the gun's slide, while Ochoa was a possible minor contributor. As for the left side of the slide, Ochoa matched the major profile while Rodriguez was a possible minor contributor. The trigger contained a DNA mixture from three separate individuals, but forensic analysis did not disclose who they

were.   A DNA sample from the brass knuckles came from a single source matching Lopez, but a person struck while wearing clothing would not transfer DNA material to the brass knuckles.

C.      *Nancy Lopez's Police Interview*

Nancy Lopez was convicted of being an accessory after the fact based on the events that occurred on December 15, 2009, and she served 16 months in prison for the offense.[2]  When Nancy denied at trial any recollection of the events, the prosecution introduced a video recording and transcript of her interview with Ontario Police Department Detectives Kevin Dempster and Roger Planas in February 2010.

She told the detectives she was dating Rodriguez's brother Eddie.  On the night of the crash, she, defendants, and another friend, Eva Aguilar (known as "Denise") headed in her car from Los Angeles County to Fontana to pick up a friend of hers named Zina.  Nancy drove and along the way they stopped at a gas station near the TA truck stop.   Nancy claimed she simply left Rodriguez and Lopez at the gas station when they went to use the restroom because she was in a hurry to pick up Zina.  When she returned to pick them up, the entrance to the freeway was blocked and there were police cars everywhere.

Nancy blurted out in her interview, "It wasn't even supposed to be like that. They were supposed to wait for me.  I was gonna come right back."  She denied knowing Rodriguez or Lopez had a gun.  She added, "Nolan [Lopez] and Mike [Rodriguez] knew that I'm not down with that bullshit[,] that carjacking shit [and] all that."  Nancy explained that she did not commit such crimes because she has children.  She never

---

[2]      Because she shares the same last name as defendant Lopez, we use Nancy's first name for convenience to distinguish the two and intend no disrespect.

thought Rodriguez and Lopez would put her in such a situation. She let them out of her car, told them to use the restroom, went to pick up Zina, and came back. She did not know what happened while she was gone.

A detective showed Nancy a photo of Ochoa and told her he was killed hauling grape juice. The detective continued, "You knew those guys were up to that." Nancy responded, "No, I didn't. But, I had a clue. That's why I left them there." Nancy said she told Lopez, "[D]on't do that to me." She also told Lopez that if they were going to "do something else," she was leaving. After she left, Rodriguez's brother Eddie telephoned her. He told her to return to the truck stop to look for Rodriguez and Lopez. When she did, the area was blocked off. She drove around for awhile, but gave up on finding them, and returned to Lopez's home.

When a detective asked Nancy, "What was [their] intentions [*sic*]," Nancy noted that they did not say explicitly and the plan was to pick up Zina. She observed, however, "By that time I knew that they wanted to do something else because they were looking everywhere. I was like, Nolan, don't do this to me, don't do this to me." Lopez asked her, "What am I doing?" Nancy told Lopez she was not stupid. At the same time, Rodriguez kept pointing at trailers and remarking, "Did you see that?" Nancy left because she did not want any part of it.

The detective asked, "What did you guys talk about . . . that caused you to leave 'em." Nancy responded, "That they were going to go jack the trailer." Rodriguez pulled a gun out of his waistband in the backseat. Aguilar said, "Whoa," and told him to put it away, which he did.

Nancy also told the detectives that Lopez directed Rodriguez to put the gun away. Rodriguez asked Lopez, "[D]o I take it with me?" Lopez said, "'Yeah, put it

10

away." At that point, Nancy left the two of them at the truck stop and went to pick up Zina. She did not intend to go back, but changed her mind when she received a call from Eddie.

Nancy further explained that after she learned of the gun, she ordered defendants out of the car. When Lopez asked her to wait, she refused and left. When asked her what kind of trucks defendants were talking about while they were in the car, Nancy explained they merely said they were "gonna come up big." They walked away when she dropped them off at the truck stop. After she left, Eddie called her to tell her something happened, gave her Ochoa's cell phone number with a 559 area code, and directed her to pick up Rodriguez and Lopez. Nancy tried the number several times but there was no answer. She returned to the area, saw a truck flipped over, and suspected defendants were involved. She called Eddie back, who told her to keep looking for defendants. She, Aguilar, and Zina looked for defendants until around 1:00 a.m., when she refused Eddie's order to continue looking.

Nancy also explained she became worried when she exited the freeway for gas, but found only a truck stop because she "knew what kind [of] intentions they had." Once she realized what was going on, she wanted to leave them there and play no part in whatever they were going to do. When she bought a hot dog at the truck stop, Lopez said, "You're gonna be eating better than this." She cried as she pumped gas, begging Lopez to tell her what he was going to do. Lopez said she should not worry, he would be good. Rodriguez and Lopez departed, with Lopez saying to her, "Go your way and I'll go my way." Lopez added that they would meet back up at his house. He told her that if anyone asked, she should say she dropped him off at the restroom and left. Nancy told

11

Lopez to get back in the car so they could pick up Zina, but Lopez responded, "No, I need to do this."

D.    *Defense Case*

Rodriguez testified that on December 15, 2009, he, Nancy, and Aguilar celebrated Lopez's birthday at Lopez's house, using methamphetamine and drinking alcohol. They drove to Fontana to pick up Zina, a stripper. Rodriguez sat in the back seat of Nancy's car with Aguilar, and when he and Aguilar argued, he "jumped out of the car," and Lopez followed him.

They tried to hitchhike after the two women drove away, and when Ochoa stopped his truck and rolled down his window, Lopez told Ochoa they were stranded. Lopez asked Ochoa for a ride to his (Lopez's) brother's house in La Puente and offered to pay for the ride. Ochoa agreed and accepted the money Lopez handed him.

Lopez and Ochoa discussed trucks, and then Ochoa let Lopez drive while Rodriguez sat in the front passenger seat and Ochoa rode in the back of the cab. As Lopez entered the freeway, Ochoa exclaimed, "Hey, where are you guys going? Fontana is the other way." But Rodriguez laughed and explained, "We're not going to Fontana." Ochoa nevertheless ordered Lopez to pull over. When Lopez protested, "Are you serious? I just paid you," Ochoa pulled out a gun, pointed it at the back of Lopez's head, and said, "[S]top the truck." Rodriguez unbuckled his seat belt and tried to get the gun away from Ochoa, hitting Ochoa in the face and biting his wrist. Rodriguez and Ochoa grappled in the bunk area of the truck, where Rodriguez struggled for the gun, which discharged at least once before Rodriguez secured it. When Ochoa reached for a stick, Rodriguez thought it was another gun so he started firing. The truck crashed and Rodriguez fell to the floor, where he saw Ochoa's cell phone, which he took because he

12

was stranded and needed to call someone for a ride. He exited the truck through the driver's side window, climbed up the culvert, went to the CarMax, jumped over a wall, and ran through the parking lot, throwing the gun and the magazine over the wall. He ran because he was scared, he did not want to go to jail, and he had previous bad experiences with law enforcement.

Lopez also testified. He explained that on December 15, he, Rodriguez, Aguilar, and Nancy had been drinking and using methamphetamine when they went in Nancy's car to pick up Zina. Lopez took a pair of brass knuckles with him because when he first met Zina, she was with a "big guy" who was either her boyfriend or her pimp. As they drove on Interstate 10, Lopez sat in front with Nancy, drinking beer, listening to music, and talking to Zina on the phone.

Lopez handed the phone to Rodriguez, which caused an argument between Rodriguez and Aguilar. Nancy needed gas, so they pulled off, pumped the gas, and returned to the car, but Rodriguez and Aguilar were still arguing. Nancy told Rodriguez, "Get the fuck out of my car," so Rodriguez exited the vehicle. Lopez also exited to attempt to calm Rodriguez down. Nancy drove up, declared she did not want Rodriguez back in the car, ignored Lopez's entreaties to change her mind, and drove away.

When Lopez and Rodriguez started hitchhiking, they spotted Ochoa parked outside the truck stop, sitting in his truck doing paperwork. Ochoa initially rejected their request for a ride because he was done driving for the night, but when they explained their predicament and offered to pay him $60, Ochoa agreed. Lopez explained he previously had driven trucks and Ochoa agreed to let him drive to La Puente when Lopez showed Ochoa his driver's license.

13

Ochoa ordered Lopez to drive on an access road to test his driving skills before entering the freeway. Lopez complied, but when he turned onto the freeway, Ochoa screamed, "Where are you going?" Lopez followed Ochoa's directive to pull over and park the truck, but Ochoa still struck him on the head with an object. Lopez saw that Ochoa held a gun, and Rodriguez grabbed for the weapon, but a shot discharged and Lopez veered sharply to the right, sending the truck into the culvert.

After the crash, Lopez grabbed Ochoa's wallet, thinking it was his, and exited the truck through the driver's side window. He also mistakenly picked up Ochoa's gold ring with the horse emblem at this time. Hearing police sirens, he panicked, ran, and hid in some bushes, where he fell asleep until the police dog bit his leg.

E.      *Prosecution rebuttal case*

The medical examiner testified Ochoa had no bite wounds anywhere on his body. He also diagrammed from the entry and exit wounds on Ochoa's body the trajectory of the fatal shots, and explained the sequence of events described by defendants was not possible.

Detective Gary Naranjo of the Ontario Police Department testified that when he monitored an interview with defendants at the police station, he obtained a press release about the case. He modified the press release by placing some signature lines on it, writing the word "shooter" below Rodriguez's name, and writing the word "accomplice" below Lopez's name. He also added, "do not release info." and "do not give video to press." Finally, he added "approved by" and his signature.

Naranjo gave the press release to Sergeant David McBride, a press information officer, who entered the interview room and told defendants he was with the media department. He explained he would leave the press release for them to read over,

14

ensure it was correct, and sign it. When McBride left the room, the police recorded the following conversation: "Rodriguez: 52? When did you become 52? Oh — shit. We offed the old guy. You know we're all washed up right? [¶] Lopez: We're what? [¶] Rodriguez: We're all washed up. [¶] Lopez: [Inaudible] nothing. [¶] Rodriguez: I didn't tell them shit. [¶] Lopez: I didn't tell them shit either. They came up with their own. I told them I wanted a lawyer."

## II

## DISCUSSION

A. *The Trial Court Did Not Err in Concluding Zina Was Not a Material Witness and Therefore Her Personal Contact Information Need Not Be Disclosed*

Rodriguez and Lopez contend the trial court erred in denying his pretrial motion to compel the prosecutor to disclose Zina's full identity and contact information, arguing she was a material witness to his alleged offenses. The issue arose when Rodriguez's trial counsel questioned Ontario Police Detective Roger Planas about Zina, but the detective asserted a privilege under Evidence Code section 1040 et seq. Rodriguez viewed Zina as a police informant subject to disclosure because Planas interviewed her about the case.

Evidence Code section 1041 provides that a law enforcement officer may decline to disclose the identity of an informant if it "is against the public interest because a necessity for preserving the confidentiality of his or her identity outweighs the necessity for disclosure in the interest of justice." (Evid. Code, § 1041, subd. (a)(2).)

In pertinent part, Evidence Code section 1042, subdivision (d), provides: "When, in any . . . criminal proceeding, a party demands disclosure of the identity of the informant on the ground the informant is a *material witness on the issue of guilt*, the court shall conduct a hearing at which all parties may present evidence on the issue of

15

disclosure. . . . During the hearing, if the privilege provided for in [Evidence Code] Section 1041 is claimed by a person authorized to do so . . . , the prosecuting attorney may request that the court hold an in camera hearing. If such request is made, the court shall hold such a hearing outside the presence of the defendant and his counsel." (Italics added.)

The in camera hearing must be conducted with a reporter present, and the trial court must seal the transcript. (Evid. Code, § 1042, subd. (d).) Following the hearing, "[t]he court shall not order disclosure, nor strike the testimony of the witness who invokes the privilege, nor dismiss the criminal proceeding, if the party offering the witness refuses to disclose the identity of the informant, unless, based upon the evidence presented at the hearing held in the presence of the defendant and his counsel and the evidence presented at the in camera hearing, the court concludes that there is a reasonable possibility that nondisclosure might deprive the defendant of a fair trial." (*Ibid.*)

"An informant is a material witness if there appears, from the evidence presented, a reasonable possibility that he or she could give evidence on the issue of guilt that might exonerate the defendant." (*People v. Lawley* (2002) 27 Cal.4th 102, 159.) "'The defendant must show that the informant was in a position to perceive '"the commission or the immediate antecedents of the alleged crime." [Citation.]'" (*Davis v. Superior Court* (2010) 186 Cal.App.4th 1272, 1276-1277 (*Davis*).) Disclosure is not necessarily required even if the informant was a percipient witness. "Rather, disclosure occurs only if the defendant makes an adequate showing that the informant can give exculpatory evidence." (*Id.* at p. 1277.) We review a trial court's nondisclosure ruling for abuse of discretion. (*Ibid.*)

16

Here, Rodriguez and Lopez request that we review the in camera hearing, and the Attorney General does not oppose the request. Defendants suggest Zina may have been a material witness harboring information that could cast the case in a different light sufficient to undermine confidence in the verdict (*Kyles v. Whitley* (1995) 514 U.S. 419, 432), including the credibility of key witnesses. (*People v. Ruthford* (1975) 14 Cal.3d 399, 406, overruled on other grounds in *In re Sassounian* (1995) 9 Cal.4th 535, 545, fn. 6.) Rodriguez suggests Zina "could have some knowledge about the events" preceding or following the shooting, including "evidence which could have supported Rodriguez's argument that Nancy was an accomplice." He argues, "It is hard to believe that Nancy did not discuss in detail in Zina's presence the events at the truck stop or en route to Ontario."

But it is not enough that Nancy may have discussed the events with Zina, as that would transform *any* person with whom Nancy spoke at *any* time into a material witness, regardless of what was said, even if that person had nothing to do with the alleged offense. In any event, nothing in the in camera transcript supports Rodriguez's unfounded suppositions. The district attorney reviewed with Planas his recollection of his interview with Zina, and the trial court cross-examined Planas. Nothing in the transcript suggests Zina told Planas anything different about the events of the evening than Nancy told the detectives, or that Zina suggested Nancy was an unreliable witness because she was under the influence of alcohol or drugs. Nor does the transcript show that Nancy told Zina anything about her conversations with Rodriguez and Lopez, whether they possessed a gun, or what their intentions were that evening.

And nothing in the record suggests Zina had any independent knowledge that would make her a material witness. She admitted she viewed the truck stop and saw

17

Ochoa's overturned trailer when she accompanied Nancy to the scene, but that was well after the offense. Nothing suggests Zina had any meaningful personal knowledge of the offense or the events leading up to it. The defendant's showing "must rise above the level of sheer or unreasonable speculation" (*Davis*, *supra*, 186 Cal.App.4th at p. 1276), but here nothing demonstrates the trial court erred in concluding Zina was not a material witness, and therefore the court did not abuse its discretion in declining to order full disclosure of her identity.

B. *No Error in Admitting Victim's Last Words as a Dying Declaration or Spontaneous Utterance*

Rodriguez and Lopez argue the trial court erred by granting the prosecutor's pretrial motion to admit under a hearsay exception the testimony of two bystanders concerning Ochoa's last words at the accident scene. (See Evid. Code, § 1200, subd. (b) ["Except as provided by law, hearsay evidence is inadmissible"].) After Ochoa crawled out of the ditch in which his truck had crashed, and stumbled up to the road and under the Lamberts' trailer, Connie Lambert came to his aid and noticed he was covered in blood and had a gunshot wound in his upper chest. Ochoa told her he had been robbed. Similarly, Mario Miranda also stopped his truck to see if he could assist at the scene, where he found Ochoa in agonizing pain and "poor shape," responding briefly in Spanish when Miranda asked him what happened, "Mi robaton, mi tiraron valasos," meaning in English, "I got robbed and I was shot." Rodriguez insists these statements fail to qualify under exceptions to the hearsay rule as a dying declaration or a spontaneous utterance. As we explain, the trial court did not err in admitting these statements.

The Evidence Code sets forth an exception for dying declarations as follows: "Evidence of a statement made by a dying person respecting the cause and

18

circumstances of his death is not made inadmissible by the hearsay rule if the statement was made upon his personal knowledge and under a sense of immediately impending death." (Evid. Code, § 1242.) "'Th[e] sense of impending death may be shown in any satisfactory mode, by the express language of the declarant, or be inspired from his evident danger, or the opinions of medical or other attendants stated to him, or from his conduct, or other circumstances in the case, all of which are resorted to in order to ascertain the state of the declarant's mind.'" (*People v. Tahl* (1967) 65 Cal.2d 719, 725.)

Spontaneous statements similarly may be admitted under Evidence Code section 1204, which provides: "Evidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception." Spontaneous declarations are excepted from the hearsay rule because the stress of exciting events stills the declarant's ability to reflect and deliberate, thereby lending trustworthiness to the declarant's comments. (*People v. Saracoglu* (2007) 152 Cal.App.4th 1584, 1588.) We review a trial court's decision to admit a statement as a dying declaration or a spontaneous utterance for abuse of discretion. (*People v. Mayo* (2006) 140 Cal.App.4th 535, 553 (*Mayo*); *People v. Ramirez* (2006) 143 Cal.App.4th 1512, 1523.)

Rodriguez argues that "[n]othing in the evidence suggests Ochoa believed that he was in danger of 'immediate death.' Merely being wounded in the abdominal cavity does not, as a matter of law, establish loss of all hope." According to Rodriguez, no evidence shows Ochoa's mental state when he uttered the words attributed to him, let alone any suggestion he knew he faced death. Instead, Rodriguez surmises from

19

Lambert's nearby 911 call that Ochoa knew paramedics were on their way, and Rodriguez reasons that because Ochoa "was still conscious and coherent" when they arrived, nothing indicated Ochoa believed he was near death when he earlier made his statements to Lambert and Miranda. He similarly argues that after the altercation and crash leading to his injuries, Ochoa had "become calm enough to understand" and answer Lambert and Miranda "coherently," so his statements therefore could not qualify as spontaneous or excited utterances.

The victim, however, need not overtly state a fear of impending death, which the trial court may infer from the circumstances. (*Mayo*, *supra*, 140 Cal.App.4th at p. 553.) Here, Ochoa was grievously wounded when Lambert and Miranda found him in agonizing pain, covered in blood, and suffering from three gunshot wounds, two of which proved fatal. (See *People v. Monterroso* (2004) 34 Cal.4th 743, 763 [wound "'of a great magnitude and dangerous in itself'" may prompt thoughts of death].) Another bystander had been unable to understand anything Ochoa said. While the paramedics arrived quickly and loaded Ochoa into an ambulance, he became unresponsive within 10 minutes on the way to the hospital, requiring chest compressions, and he died within an hour of what appear to have been his final words to Lambert and Miranda. The fact Ochoa spoke his last words coherently does not indicate he was calm and composed, as Rodriguez infers; to the contrary, several witnesses at the scene described him in a state of shock. Based on the foregoing, the trial court reasonably could infer Ochoa knew he was grievously wounded and therefore admit Ochoa's statements as a dying declaration or spontaneous utterance; there was no error.

20

C.      *References to Other Possible Carjackings*

Rodriguez and Lopez each challenge the trial court's pretrial ruling authorizing the admission of statements Nancy made in her interview with the police suggesting Rodriguez and Lopez previously committed carjacking offenses. The statements occurred in several short exchanges between Nancy and the detectives reflected in the interview transcript, which fills more than 100 pages in the record. At trial, once Nancy claimed she did not recall any details of the events on the date of the offense or her statements to the detectives, the trial court allowed the prosecutor to play the video recording of her interview with the detectives.

Over defendants' objection, the trial court concluded Nancy's references in the interview to possible prior carjackings were admissible under Evidence Code section 1250 to show Nancy's state of mind, which in turn explained her conduct. Specifically, the statements were admissible to explain in part why Nancy believed Rodriguez and Lopez were going to commit a carjacking or similar offense at the truck stop, and therefore required them to exit her car because she did not want to be part of the offense. The trial court observed the references in Nancy's statement were brief, and declined the defense request to exclude the tape or redact the references.

Defendants contend the purported prior instances Nancy alluded to in her interview were not, as the prosecutor argued, sufficiently similar to the charged offense for admission as evidence of motive, lack of mistake, or a common plan or scheme (Evid. Code, § 1101, subd. (b)). None involved a large semi-trailer truck and Nancy disclaimed any knowledge of how defendants committed the alleged prior carjackings. But defendants also claim Nancy's references to their supposed prior offenses were particularly prejudicial and inadmissible as propensity evidence (Evid. Code, § 1101,

subd. (a)) because of the similarity between carjackings and the alleged truckjacking. Although defendants' argument is thus somewhat inconsistent, the inconsistency does not factor in our conclusion. As we explain, the trial court erred in admitting the carjacking allusions under Evidence Code section 1250 *without a limiting instruction* that the jury was only to consider the alleged prior instances in assessing Nancy's state of mind and not for their truth. But precisely because the jury was entitled to consider that Nancy's state of mind included her belief Rodriguez and Lopez intended to commit a carjacking or similar offense, and in view of the other overwhelming evidence of their guilt, the error in failing to include a limiting instruction was harmless.

1.    Statements

Nancy's statements concerning carjacking in her colloquy with the detectives included the following: "[Q]: You made a comment earlier [] you don't get involved in carjacking. [¶] [A]: Uh-huh. [¶] I mean, you know these guys have done it before. [¶] [A]: I don't know that for a fact but I – [¶] [Q]: Yeah, you do know it for a fact because you said it not five minutes ago. Cuz that's what got, I mean, if the guys are sitting in a parking lot looking around and you're not gonna know what they're doing but you knew that they had jacked trucks before, right? [¶] [A]: Not trucks but cars. [¶] [Q]: Cars? [¶] [A]: Anything – I don't know."

Later, "[Q]: And you're starting to think – because you know that these guys have jacked cars before, jacked trucks before, right? [¶] [A]: M-hm. [¶] [Q]: How many times . . . before have they done that? [¶] [A]: I don't know. Exactly, I don't know. [¶] [Q]: That's the information we're getting to[o]. [¶] [A]: Hm? [¶] [Q]: This is not the first time that these guys have done this. [¶] [A]: Uh-huh. [¶] [Q]:

22

And you that too, right? That's why you got worried. [¶] [A]: Well yeah, because I knew what kind [of] intentions they had."

Similarly, "[Q]: You . . . know they had jacked semis before because you got worried when you got off the freeway and you saw the truck stop. [¶] [A]: Because they said they were going to come up big. I never knew . . . they had ever jacked a truck before. . . . [¶] [Q]: How many other times have they done this? [¶] [A]: That's the first that I know of — [¶] [Q]: That's not what you told me earlier. [¶] [A]: That's the first that I know that they carjacked a big one like that. [¶] [Q]: But you told me they have, they carjacked car[s] before? [¶] [A]: Probably. [¶] [Q]: Probably? [¶] [A]: Yeah, they have. [¶] [Q]: When did those happen? [¶] [A]: Like they would always talk about it. Just that that's it, that's how they come up. That's it. [¶] [Q]: How many other times? . . . [¶] [A]: They just talk about it that they [*sic*] done it. [¶] [Q]: How many times? [¶] [A]: They never said how many times. They just say remember this, remember that and that's it. [¶] [Q]: What do you mean . . . ? [¶] [A]: Like they would talk amongst themselves and they would say remember this and remember that like remember when we got this and remember when we got that one. [¶] [Q]: When we got what, I mean? [¶] [A]: The cars — stupid little cars. . . . Oh remember when we just got a backpack full of CD's and that's it, stuff like that. . . . [¶] [Q]: How many other trucks have they jacked? [¶] [A]: That I know of, none. I didn't even know they knew how to drive a truck."

Toward the end of the interview, the issue came up again: "[Q]: We were talking about those other cars that they jacked – what did they do with those cars? [¶] [A]: I don't know I never [*sic*] seen them in another car . . . . [¶] [Q]: But the carjacking[s] that you talked about were — [¶] [A]: I said they just talk about it, I never

23

[*sic*] seen them do any of that. [¶] [Q]: Well they had to have told you hey we jacked this guy for this amount, and we followed him to his pad, and — [¶] [A]: No, not like that. I guess they would just get the cars off the street and that's it. They wouldn't point no gun at nobody and stuff like that. [¶] [Q]: So they were just stealing off the street . . . . Or were they jacking the people driving the cars? [¶] [A]: . . . stealing cars off the street."

These statements about earlier carjackings Rodriguez and Lopez may have committed did not themselves amount to descriptions of Nancy's state of mind at the truck stop, but they informed Nancy's belief defendants seemed to be intent on committing a crime to "come up" with significant robbery proceeds. Near the beginning of her police interview, Nancy blurted out, "Nolan and Mike knew that I'm not down with that bullshit that carjacking and all that." She added that she never thought defendants would involve her in this situation. She said she "had a clue" about their plans, so she left them at the truck stop. She pleaded with Lopez, "Don't do this to me." She said she "did not want anything to do with it" and if they were "going to do something else," she was leaving. Once she realized what was happening, she wanted to leave defendants and have no part in their plans. Lopez told her, "I need to do this."

2.      Governing Law and Analysis

In pertinent part, Evidence Code section 1250 provides: "[E]vidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule when: [¶] (1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or [¶] (2) The evidence is

24

offered to prove or explain acts or conduct of the declarant." Ordinarily, statements admitted under Evidence Code section 1250 are received without limitation, subject only to section 352.[3] (*People v. Ortiz* (1995) 38 Cal.App.4th 377, 389 (*Ortiz*).)

But a different analysis is required when the statements are used to *infer* the declarant's state of mind. As explained in *Ortiz*, *supra*, 38 Cal.App.4th at page 389, "[A] statement which does not directly declare a mental state, but is merely circumstantial evidence of that state of mind, is not hearsay. It is not received for the truth of the matter stated, but rather whether the statement is true or not, the fact such statement was made is relevant to a determination of the declarant's state of mind." The trial court must provide the jury with a limiting instruction because "the declaration is not received for the truth of the matter stated and can only be used for the limited purpose for which it is offered." (*Ibid.*)

A proper limiting instruction would have explained to the jury that while Nancy's statements reflected her belief Rodriguez and Lopez may have committed past carjackings, could be considered as a basis[4] for her state of mind at the truck stop – namely, that she believed they intended to commit a carjacking or similar offense – those statements were not admitted for the jury to determine their truth or falsity, but only to understand Nancy's mental state and decision to leave the defendants behind. By

---

[3] Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

[4] Other grounds for Nancy's belief at the time included her circumstantial knowledge Rodriguez had armed himself and displayed a gun in the backseat of her car, defendants' actions in apparently surveying potential carjacking targets, their statement they "were gonna come up big," and Lopez's response, "I need to do this," when Nancy pleaded to the contrary, "Don't do this to me."

25

explaining the statements were not admitted for the truth of the matter asserted, such a limiting instruction would have had the additional benefit of resolving defendants' objection the statements amounted to improper propensity evidence. (Evid. Code, § 1101, subd. (a).) Nevertheless, it is not reasonably probable that omitting the limiting instruction affected the outcome of the trial, and the error was therefore harmless. (See *People v. Carrillo* (2004) 119 Cal.App.4th 94, 103 [judgment reversed only if the defendant would have obtained a more favorable result absent the evidentiary error].)

We are confident the lack of a limiting instruction did not change the trial outcome for several reasons. As noted, Nancy's knowledge defendants may have committed other carjackings was not the only basis for her belief they intended to commit a crime at the truck stop; rather, she knew they had a gun and their words and actions in her presence suggested they were plotting a robbery. Additionally, her statements about their supposed prior activities were equivocal. The detectives repeatedly characterized Rodriguez and Lopez as experienced carjackers, but Nancy suggested the truth was much less ominous. Instead, when the duo bragged in her presence, "remember when we got this and when we got that one," they were merely recalling petty thefts from parked vehicles. As Nancy summarized: "The cars – stupid little cars. Oh remember we just got a backpack full of CD's and that's it, stuff like that." Nancy's recollection was consistent with defendants' criminal history; Rodriguez had been convicted of auto theft, not carjacking, and Lopez's record included misdemeanor firearm possession. When the detectives pressed their carjacking characterization, Nancy responded, "No, not like that. I guess they would just get the cars off the street and that's it. They wouldn't point no gun at nobody and stuff like that."

26

In any event, the evidence of defendants' guilt was overwhelming. The jury was entitled to consider Nancy believed Rodriguez and Lopez intended to commit a robbery, Ochoa stated he was robbed, defendants were apprehended at the scene with Ochoa's belongings, and the forensic evidence established defendants' self-defense claim was an impossible lie. Defendants' bid for reversal therefore fails.

D.      *The Trial Court Properly Denied Lopez's Motion to Dismiss the Gang Allegations*

Lopez argues the trial court erred in denying his pretrial motion under section 995 to dismiss the gang-related penalty enhancement allegations under section 186.22, subdivision (b), which he asserts extended to the gang special circumstance allegation in section 190.2, subdivision (a)(22). Lopez did not challenge the special circumstances allegation in his motion, but insists its dismissal necessarily was required along with the enhancement allegations for lack of evidence. Lopez sought writ relief for the trial court's denial of his motion, which Division Two summarily denied, and as we explain he fares no better on appeal.

The gang enhancement requires the prosecutor to prove: ( 1) the crime was committed for the benefit of, at the direction of, or in association with any criminal street gang; and (2) the crime was committed with the specific intent to promote, further, or assist in any criminal conduct by gang members. (§ 186.22, subd. (b)(1)(A); *People v. Villalobos* (2006) 145 Cal.App.4th 310, 322.) The gang murder special circumstance similarly has two elements: (1) the defendant was an active participant in the gang when he committed the crime; and (2) the crime was carried out to further the activities of the gang. (*People v. Carr* (2010) 190 Cal.App.4th 475, 486.) A defendant actively participates in a criminal street gang when he or she: ( a) was more than a nominal member of the gang, (b) knew its members engage in or have engaged in a pattern of

27

criminal gang activity, and (c) willfully promoted, furthered, or assisted in felonious criminal conduct by members of that gang. (*People v. Lamas* (2007) 42 Cal.4th 516, 524.)

"A defendant may utilize section 995 to strike invalid enhancement allegations." (*Hale v. Superior Court* (2014) 225 Cal.App.4th 268, 271.) The standard of review on appeal is abuse of discretion, and the reviewing court therefore must "consider the evidence in the light most favorable to the ruling and draw all reasonable inferences in favor of the lower court's decision." (*Ibid.*) The issue in a set aside motion is whether the defendant has "been committed without reasonable or probable cause." (§ 995, subd. (a)(2)(B).) There must be merely "*some*" evidence from which each element of the charged offense can be inferred. (*Williams v. Superior Court* (1969) 71 Cal.2d 1144, 1148; *Rideout v. Superior Court* (1967) 67 Cal.2d 471, 474; *Salazar v. Superior Court* (2000) 83 Cal.App.4th 840, 842.) "Thus, an . . . information should be set aside only when there is a total absence of evidence to support a necessary element of the offense charged. [Citations.]" (*People v. Superior Court (Jurado)* (1992) 4 Cal.App.4th 1217, 1226.)

Lopez correctly notes a defendant may not complain on appeal that the trial court erred in failing to grant a a section 995 pretrial motion to dismiss unless the defendant shows he was deprived of a fair trial or otherwise suffered prejudice as a result. (*People v. Millwee* (1998) 18 Cal.4th 96, 121; *People v. Arjon* (2004) 119 Cal.App.4th 185, 192.) Lopez contends the trial court's erroneous denial of his 995 motion to dismiss the gang enhancements "opened the door to admission of extremely prejudicial testimony linking Lopez to criminal conduct Camarillo testified was the hallmark of Florencia 13." Because the jury found the gang special-circumstance allegation and the gang

enhancements not true, it is doubtful the defendants suffered prejudice from the alleged erroneous denial of their 995 motions. True, gang evidence poses a substantial risk of undue prejudice, but the jurors here evidently weighted the evidence dispassionately, as demonstrated by their rejection of the gang allegations. We need not determine whether defendants were prejudiced, however, because the trial court did not err in denying the 995 motions. Here, there was ample evidence in the form of express admissions, a body tattoo, and possession of gang paraphernalia that Rodriguez was an active Florencia 13 gang member. A gang expert specializing in the Florencia 13 gang, Detective Dean Camarillo, explained the gang's pertinent primary activities included street robberies, assault with a dangerous weapon, murder and manslaughter, and that a Florencia 13 member would not typically commit a crime of the current offense's magnitude without someone closely associated with the gang. He also explained a unique tractor-trailer truck jacking would benefit Florencia 13 in myriad ways, including enhancing its reputation for violence. The prosecution's gang experts also noted gang members often divulge their criminal exploits to burnish their reputation, just as Nancy's police interview highlighted Rodriguez's and Lopez's habit of openly discussing their past and present criminal endeavors.

This evidence exceeded the modicum necessary to support the gang allegations and special circumstance. Specifically, the trial court reasonably could infer from the foregoing evidence that Lopez knew Florencia 13 engaged in a pattern of criminal gang activity and he participated in the gang in more than a nominal manner, including his participation in the present offense, which the trial court reasonably could conclude amounted to willfully promoting, furthering, or assisting in felonious criminal conduct by members of the gang and similarly reflected an intent to promote, further, or

29

assist in that same criminal conduct either in implicit association with Florencia 13 or in a manner that would benefit the gang. Consequently, probable cause supported the gang charges and the trial court did not abuse its discretion in rejecting Lopez's set aside motion.

E.      *Accomplice Instructions*

Rodriguez contends the trial court erred in failing to instruct the jury on the special circumstances allegations that Nancy was an accomplice as a matter of law. The trial court instead left that determination to the jury. (CALCRIM No. 707, Special Circumstances: Accomplice Testimony Must Be Corroborated — Dispute Whether Witness Is Accomplice.) Lopez adds that the trial court should have given the jury an accomplice instruction requiring corroboration of Nancy's statements for all the charged offenses, not just the special circumstances allegations. (See CALCRIM No. 334, Accomplice Testimony Must Be Corroborated: Dispute Whether Witness Is Accomplice.) Rodriguez argues there is a due process component to both of these contentions because of a defendant's "constitutional right to have the jury determine every material issue presented by the evidence, to resolve disputed factual issues, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."

Notably, Rodriguez's claim based on an asserted constitutional right for juror determination of all issues seems to conflict with his claim the trial court was required to direct the jury that Nancy was an accomplice as a matter of law. In any event, Rodriguez also argues California law requiring at least "slight" corroboration of accomplice testimony for special circumstance findings violates the beyond a reasonable doubt standard required in *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*) for jury determination of any fact necessary for conviction and increased punishment. As we

30

explain, defendants' contentions concerning accomplice testimony fail to persuade us reversal is necessary.

First, the trial court was not required to instruct the jury that Nancy was an accomplice as a matter of law. An accomplice is "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (§ 1111.) Section 1111 further provides: "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense . . . ." An accomplice must "act with knowledge of [the] defendant's criminal purpose and with the intent to encourage or facilitate the commission of the offense." (*People v. Carrington* (2009) 47 Cal.4th 145, 191 (*Carrington*).) Whether a person is an accomplice is ordinarily a question of fact unless the circumstances of the offense indisputably show accomplice liability as the only possible conclusion. (*Ibid.*; *People v. Sully* (1991) 53 Cal.3d 1195, 1227-1228.)

Here, Nancy admitted in her testimony she was convicted as an accessory after the fact (§ 32) for returning to the truck stop to give Rodriguez and Lopez a ride. An accessory is not liable to prosecution for the identical offense and therefore is not an accomplice. (*People v. Fauber* (1992) 2 Cal.4th 792, 833-834.) Rodriguez relies on the rule that a getaway driver is an accomplice rather than an accessory if he or she forms the intent to aid a robbery before the perpetrator reaches a place of temporary safety. (*People v. Cooper* (1991) 53 Cal.3d 1158, 1169-1170.) But Nancy explained in her police statement she wanted no part of defendants' potential criminal activity and that she did not know whether they had committed an offense when she returned to the scene at Eddie's direction. The jury therefore reasonably could conclude she did not share the

31

requisite intent to be deemed an accomplice at the outset, nor the knowledge an offense had been committed as necessary to be considered a getaway driver. (See *Carrington*, *supra*, 47 Cal.4th at p. 191 [issue properly submitted to jury where witness may not have shared jail escapee's intent]; *People v. Tewksbury* (1976) 15 Cal.3d 953, 961-962 [same, where jury could infer witness acted without guilty knowledge or intent].) Consequently, the trial court did not err in permitting the jury to decide whether Nancy was an accomplice instead of resolving the question as a matter of law.

Second, the omission of accomplice instructions concerning the underlying charges was harmless. The trial court instructed the jury to determine whether Nancy was an accomplice and that accomplice corroboration was required for the special circumstances allegations of murder in the course of a carjacking or robbery, and for the special circumstance of gang-related murder, but not on the underlying offenses of murder, carjacking, robbery, or Rodriguez's gun possession charge. Nothing supports this inexplicable omission, but it had no impact on the trial outcome since the special-circumstances allegations the jury found to be true (murder in the course of carjacking and robbery) included the underlying offenses, apart from Rodriguez's gun possession.

Moreover, where evidence corroborates an accomplice's testimony, any error in failing to give accomplice instructions is harmless. (*People v. Miranda* (1987) 44 Cal.3d 57, 100, overruled on another ground in *People v. Marshall* (1990) 50 Cal.3d 907, 933, fn. 4.) Here, Ochoa's dying statements and the forensic evidence each amply and independently corroborated the suggestion in Nancy's police statement that Rodriguez and Lopez intended to commit a robbery or carjacking, and thus did not kill Ochoa in self-defense as they claimed. The video showing Rodriguez tossing an item the

32

jury could infer was a handgun also corroborated Nancy's statement he possessed a handgun.

Third, there was no due process violation in the trial court's failure to provide accomplice instructions on the underlying charges or in submitting the accomplice question to the jury on the special circumstances allegation instead of directing the jury to deem Nancy an accomplice as a matter of law. Simply put, there is no federal due process right to accomplice instructions. Section 1111 is an independent state law requiring corroboration of accomplice testimony; it is "not constitutionally based." (*In re Mitchell P.* (1978) 22 Cal.3d 946, 949 (*Mitchell P.*).) "Federal courts have rejected the rule, holding a 'conviction may be based on the uncorroborated testimony of an accomplice . . . .' [Citations.]" (*Ibid.*; accord, e.g., *United States v. Lopez* (9th Cir. 1986) 803 F.2d 969, 973.)

Similarly, there can be no conceivable *Apprendi* violation in the state law rule, as reflected in CALCRIM No. 707, that the evidence corroborating an accomplice's statements "may be slight," nor that the corroborating evidence "does not need to be enough, by itself, to prove that the defendant committed [the charged offenses], and it does not need to support every fact (mentioned by the witness in the statement/ [or] about which the witness testified)." (CALCRIM No. 707.) The state law requirement of accomplice corroboration does not dilute the reasonable doubt standard of proof; to the contrary, it adds a further requirement absent from federal law. (*Mitchell P.*, *supra*, 22 Cal.3d at p. 949.) Similarly, the trial court's submission of the accomplice question to the jury instead of deciding it as a matter of law cannot reasonably be said to infringe *Apprendi*, since that decision required juries instead of judges to decide facts affecting the quantum of punishment. Defendants' federal claims are thus wholly without merit.

33

F.    *Conspiracy Is a Valid Theory of Criminal Liability*

Lopez contends the trial court erred by instructing the jury a conspirator may be liable for the completed offense or offenses that formed the object of an uncharged conspiracy (CALCRIM Nos. 416 & 417).  He also argues the court erred by instructing the jury a defendant may be found guilty of felony murder not only on alternate theories of perpetrating or aiding and abetting a murder, but also for conspiring to commit robbery or a carjacking where a natural and probable consequence of the offense is murder (CALCRIM No. 540B).  Lopez recognizes conspiracy as a substantive offense (§ 182), but insists "[i]t is improper to instruct a jury on uncharged conspiracy as a theory of criminal liability."

According to Lopez, the trial court erred in identifying conspiracy as a basis of liability because the Legislature has by statute in section 31 "limited criminal liability to those who actually perpetrate a crime and those who aid and abet the actual perpetrators, but not to those who participate in an uncharged conspiracy to commit a crime."  Specifically, Lopez claims that because section 31 includes as "principals" in a crime those who "directly commit the act constituting the offense" and those who "aid and abet in its commission"—without also expressly identifying conspiracy as a basis for liability as a principal—the Legislature did not intend to punish conspirators for successfully completed offenses, but only for conspiracy, as defined in section 182.

We observe that while section 31 does not use the term "conspirator," it defines as principals not only "perpetrators" and "aiders and abettors," but also "*[a]ll* persons concerned in the commission of a crime" (italics added), including those who "not being present, have advised and encouraged its commission . . . ."  This language seems to incorporate conspiracy liability for underlying offenses, long recognized by the

34

law.  Lopez argues aiding and abetting "requires participation in the act constituting the offense," but conspiracy "need not go so far as aiding and abetting" because conspiracy consists of an agreement to commit a crime."  A jury reasonably could conclude, however, a defendant who conspires to commit a crime acts as an aider and abettor because the agreement itself encourages and promotes other conspirators to commit the agreed upon crime.  Under this scenario, criminal liability for aiding and abetting does not depend on whether the coconspirator was present when the crime was committed.  (See, e.g., *In re Hardy* (2007) 41 Cal.4th 977, 1026 ["One who conspires with others to commit a felony is guilty as a principal.  (§ 31)"].)

In any event, as Lopez recognizes in his lengthy attack, the Supreme Court has rejected his identical contention on numerous occasions, including most recently in *People v. Valdez* (2012) 55 Cal.4th 82, 149-150 (*Valdez*), which Lopez fails to cite.  He simply raises the issue to preserve it for further review.  We will not delve into settled issues the Supreme Court has resolved in controlling precedent.  (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 (*Auto Equity*).)  As the high court explained in *Valdez*, ample precedent has "'long and firmly established that an uncharged conspiracy may properly be used to prove criminal liability for acts of a coconspirator.  [Citations.]  "Failure to charge conspiracy as a separate offense does not preclude the People from proving that those substantive offenses which are charged were committed in furtherance of a criminal conspiracy [citation]; nor, it follows, does it preclude the giving of jury instructions based on a conspiracy theory [citations]."  [Citation.]' [Citations.]"  (*Valdez*, at p. 150.)  Such instructions "'correctly state[ ] the law concerning conspiracy as an alternative theory of liability.  [Citations.]  Accordingly, there was no error.'"  (*Ibid*.)

35

G.    *Felony-Murder Conviction and Sentence*

      1.    Erroneous Verdict Form Concerning Felony-Murder Was Harmless

      Observing that the verdict form and accompanying verdict form instructions the trial court furnished the jury erroneously labeled felony murder as lesser-included offenses of first degree premeditated murder, Lopez contends the error requires reversal.  (See *People v. Lopez* (1998) 19 Cal.4th 282, 288 [because felony murder requires commission of a designated felony and does not require malice, it has different elements and is not a lesser included offense of malice murder].)  "[T]echnical defects in a verdict may be disregarded if the jury's intent to convict of a specified offense within the charges is unmistakably clear, and the accused's substantial rights suffered no prejudice.  [Citations.]" (*People v. Webster* (1991) 54 Cal.3d 411, 447.)

      Defendants suffered no prejudice here given the jury *acquitted* them of first degree premeditated murder, and therefore there is no reason to suppose the jury simply found them guilty of felony murder because it was listed as a lesser included offense.  Felony murder need not be charged separately and therefore defendants suffered no prejudice in that respect.  (*People v. Morgan* (2007) 42 Cal.4th 593, 616-617 [felony special circumstance allegation provides a defendant notice the prosecution will proceed on felony-murder theory].)  Defendants articulate no prejudice arising from the technical defect in the verdict form, and none is apparent because the trial court properly instructed the jury on the requisite elements for felony murder.  We presume the jury understood and followed those instructions in finding defendants guilty of felony murder.  (*People v. Clair* (1992) 2 Cal.4th 629, 663, fn. 8; *People v. Cruz* (2001) 93 Cal.App.4th 69, 73.)

## 2.	LWOP for Felony Murder Is Not Unconstitutional

Rodriguez raises several claims attacking his felony-murder conviction and resulting LWOP sentence to preserve those claims for possible federal review because he recognizes they have been rejected under controlling precedent by our high court.  (*Auto Equity*, *supra*, 54 Cal.2d at pp. 455-456.)  For example, he argues the felony-murder special circumstance does not meaningfully circumscribe the class of offenders eligible for the death penalty or an LWOP sentence, and therefore violates constitutional norms. (U.S. Const., 8th & 14th Amends.; but see, e.g., *People v. Pollock* (2004) 32 Cal.4th 1153, 1195; *People v. Gurule* (2002) 28 Cal.4th 557, 663-664.)  He similarly argues utilizing the same facts underlying a felony-murder offense to both elevate the offense to first degree murder and to qualify the offense for special circumstance punishment amounts to an overbroad and indiscriminate dual use of facts.  And he contends the felony-murder special circumstance violates the Eighth Amendment because it includes unintentional killings within its ambit.  As noted, our Supreme Court has found no constitutional violation in these and related arguments, so we do not address them further. (*People v. Abilez* (2007) 41 Cal.4th 472, 528; *People v. Webster* (1991) 54 Cal.3d 411, 456; *People v. Marshall* (1990) 50 Cal.3d 907, 945-946.)

## H .	*Lopez's Pretrial Marsden Motion and Posttrial Faretta Motion*

### 1.	*Marsden* Motion

Lopez argues the trial court erred in denying his *Marsden* motion to obtain substitute appointed counsel on the eve of trial. (See *Marsden*, *supra*, 2 Cal.3d at p. 123 [defendant may seek to relieve and replace appointed counsel based on inadequate representation or conflict].)  Case law clearly defines court's duty of inquiry when confronted with a *Marsden* motion:  "[T]he court must inquire on the record into the

37

bases of defendant's complaints and afford him an opportunity to relate specific instances of his attorney's asserted inadequacy. [Citations.] Depending on the nature of the grievances related by defendant, it may be necessary for the court also to question his attorney. [Citations.]" (*People v. Hill* (1983) 148 Cal.App.3d 744, 753.)

The court provided Lopez ample opportunity to state his complaints about his attorney's performance. Lopez did so at length, setting forth specific examples of what he perceived as inadequate representation. After listening and questioning both Lopez and counsel further, the court decided there was no basis to replace counsel and denied the *Marsden* motion. We review a trial court's *Marsden* ruling for abuse of discretion (*People v. Vera* (2004) 122 Cal.App.4th 970, 979), and find none here.

Lopez asserted he was entitled to new counsel for several reasons: counsel could not get the truck stop surveillance videos to play to review them with Lopez on counsel's most recent jail visit; counsel did not visit Lopez often enough and, except for the last visit, counsel's multiple jail interviews with Lopez were nonsubstantive because they did not discuss trial strategy; Lopez thought counsel had made no effort to conduct witness interviews, including witnesses Lopez suggested; counsel did not retain a gang expert or DNA expert, and counsel "cussed him out" that day in court.

Counsel explained to the trial court he subsequently reviewed the surveillance videos when he obtained the necessary software from the district attorney, and the videos did not depict Lopez, who had hoped they would show him in an exculpatory manner. Counsel made multiple visits to Lopez in jail and while Lopez may have viewed them as nonsubstantive and only consisting of "paperwork," to the contrary he and his paralegal each met with Lopez in lengthy interviews on different occasions to gather information. Counsel explained his investigator contacted the detective Lopez

38

suggested would vouch for his lack of gang affiliation, but the detective would not provide a stale reference from so many years ago. The investigator had attempted to contact Nancy Lopez to no avail, the other woman in the car ("Denise") had been deported, and counsel noted Lopez had not suggested any other witnesses, nor did there appear to be other percipient witnesses. Counsel did not retain a gang expert because he felt (and was proved correct by the verdict) that he could cross-examine the prosecution's gang experts effectively. Nor did he retain a DNA expert because the DNA evidence was exculpatory to the extent the victim's DNA was not found on Lopez's brass knuckles. Since Lopez admitted his presence in the truck cab and his altercation with Ochoa, counsel did not believe further DNA testing or retaining a DNA expert would be fruitful.

Counsel admitted he swore at Lopez, telling Lopez "'to go fuck himself' when he told me that I wasn't prepared to try this case." Counsel explained he believed Lopez was "uncomfortable, I think, if I sense it right, with me having pitched . . . to him" the possibility of "negotiat[ing] with the district attorney to strike the special circumstances and the gang enhancements" given they could result in an LWOP "sentence of him dying in prison." It also appears counsel questioned Lopez's intention to proceed to trial and testify, though it remained uncertain at the time whether he would actually testify. Lopez interjected: "I'm uncomfortable with you telling me ['] what you told me . . . is a fucking lie and the jury isn't going to believe that fucking shit either.'" The trial court immediately calmed the atmosphere by noting that while the stakes in the case were high, it would resolve the pending motion "just like I would any other *Marsden* motion or any other motion . . . ." Counsel admitted, "I shouldn't have sworn at him and I lost my temper and I apologize to Mr. Lopez." Lopez responded immediately that he accepted counsel's apology ("Apology accepted").

39

Before ruling on the *Marsden* motion, the trial court inquired whether Lopez had anything to add, "Let me just ask, Mr. Lopez, is there anything else that you wish to tell me?" Lopez answered, "[T]hat's all I can recall, your Honor." The trial court noted: "As I said, Mr. Lopez, I'm guided by what you're telling me. I'm guided by Mr. Spears' experience. There are a lot of people that appear in front of me that don't even have a portion of the experience that Mr. Spears has, and yet, sometimes they're defending people with possible life imprisonment. And they don't get next to Mr. Spears in terms of his understanding of juries and the process." The court explained Lopez's case was a "complicated" one with "lots of issues that have been presented . . . many of which you probably aren't even aware of," including issues that "relate to cases when there's more than one defendant. . . . So you have able counsel, who I think has done everything he can to properly represent you, in my opinion."

The court acknowledged, "I realize there's a disagreement between you and him. I understand that but nobody wants to hear things they don't like and [that] they don't want to hear. But one of the key things about being a lawyer — and I was a trial lawyer [for] 30 years. I didn't do the cases at the level of Mr. Spears, not even close, not even close. Mine were more about money [rather] than freedom. But when you're a lawyer[,] before trial starts, you have to tell your client things they don't want to hear, that's part of your job. And, yeah, you heard the old expression 'don't kill the messenger.' Well, the point is that's what the lawyer has to do before the trial starts is to be the messenger, usually of bad things. Because the last thing you want to hear is to get all puffed up, that life's going to be really good, this is going to go well and all of a sudden see things fall apart and look at the lawyer and say[,] 'Why the heck didn't you

40

tell me?' And if the lawyer says[,] 'Well, I didn't think you'd want to hear it,' what kind of lawyer is that?"

The court observed that "a lot is riding on this, your whole life and your freedom is riding on this," so "[i]f you aren't upset and emotional at times and Mr. Spears may be the same way, I'd be surprised. I don't say that it's unnatural or unusual. I think it's more usual that this might occur, given the circumstances." The court concluded, "I don't see any conflict that's irreconcilable or difficult to handle. Some personality differences, some swearing back and forth, sure." "But I believe that there's no conflict that rises to a level that Mr. Spears should be replaced." The court ruled counsel's performance had not been deficient, and denied Lopez's *Marsden* motion.

On appeal, given he accepted counsel's apology and they appeared to leave the swearing outburst behind them, Lopez does not focus on that incident, nor does he assert an irreconcilable conflict remained, but instead he claims the trial court put too much stock in counsel's experience and did not adequately inquire into counsel's alleged failings. In particular, he faults the court for failing to follow up on his claims that "Spears failed to interview witnesses suggested by Lopez, and that Spears failed to engage the services of a defense DNA expert."

But the trial court did not rely exclusively on counsel's experience; to the contrary, he elicited and considered Lopez's complaints, followed up to learn whether there was anything Lopez wanted to add, and specifically noted, "I'm guided by what you're telling me." Despite the trial court's request for further detail, Lopez did not suggest he had told counsel of other witnesses to interview, nor did he voice any reason for a DNA expert when counsel explained the DNA was consistent with Lopez's defense. Nothing suggests the trial court should have rejected counsel's explanations, which the

41

court was entitled to credit.  (*People v. Smith* (1993) 6 Cal.4th 684, 696.)  In any event, a dispute over tactics and trial strategy does not justify a substitution (*People v. Jackson* (2009) 45 Cal.4th 662, 688), nor does a client's frustration (*ibid.*) or lack of trust (*People v. Berryman* (1993) 6 Cal.4th 1048, 1070, overruled on another ground in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1.)

Similarly, the number of times one sees his attorney, and the way in which one relates with his attorney, does not sufficiently establish incompetence, and defendant's complaints regarding inadequate investigation or trial preparation are essentially tactical disagreements that do not by themselves constitute an irreconcilable conflict.  (*People v. Cole* (2004) 33 Cal.4th 1158, 1192; see *United States ex rel. Kleba v. McGinnis* (7th Cir.1986) 796 F.2d 947, 954 ["We know of no case establishing a minimum number of meetings between counsel and client prior to trial necessary to prepare an attorney to provide effective assistance of counsel"].)  The trial court did not abuse its discretion in denying Lopez's *Marsden* motion.

2.    New Trial Motion

Lopez contends the trial court erred in denying the *Faretta* request he made on the day of sentencing to represent himself.  Lopez made his request at a new trial hearing preceding the sentencing hearing.  Lopez's attorney and Rodriguez's attorney had worked together to file the new trial motion, but Lopez's attorney could not appear at the hearing following a surgical procedure.  Lopez apparently did not object to Rodriguez's attorney specially appearing on his behalf for the hearing on the new trial motion, but sought leave to represent himself to file another new trial motion alleging ineffective assistance of counsel.  In seeking to represent himself, Lopez also sought a continuance

to file his new trial motion.   As we explain, the trial court did not err in denying the motion.

A criminal defendant has the right to self-representation under the Sixth and Fourteenth Amendments.  (*Faretta*, *supra*, 422 U.S. at p. 819 ["The Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense"].)  "A trial court *must* grant a defendant's request for self-representation if the defendant knowingly and intelligently makes an unequivocal *and timely* request after having been apprised of its dangers."  (*People v. Valdez* (2004) 32 Cal.4th 73, 97-98, italics added.)  As the California Supreme Court has explained, "In most of the cases finding a [*Faretta*] motion timely as a matter of law, no continuance would have been necessary."  (*People v. Burton* (1989) 48 Cal.3d 843, 854.)

A request to waive counsel made on the day of trial is untimely.  (*People v. Carlisle* (2001) 86 Cal.App.4th 1382, 1390.)  Courts have upheld denial of self-representation demands made several days before trial.  (See *People v. Scott* (2001) 91 Cal.App.4th 1197, 1203 [four days in advance].)  As noted in *People v. Hill*, *supra*, 148 Cal.App.3d 744, "'[I]t is now settled that a trial court may *deny* a request for self-representation made on the very eve of trial, on the ground that granting the motion would involve a continuance for preparation . . . .'"  (*Id*. at p. 757.)  The requirement exists "to avoid unjustifiable delay or disruption of orderly court proceedings."  (*People v. Ruiz* (1983) 142 Cal.App.3d 780, 791 (*Ruiz*).)  These considerations apply to posttrial *Faretta* motions.  (*People v. Doolin* (2009) 45 Cal.4th 390, 454-455 ["Defendant's request [at sentencing] was manifestly untimely. . . .  He was not prepared to proceed and could not provide a reasonable estimate of when he would be ready"].)

43

An untimely self-representation request is committed to the trial court's sound discretion. (*Ruiz*, *supra*, 142 Cal.App.3d at p. 792.) The court should inquire into and consider several factors related to the request, including: "[1] the quality of counsel's representation of the defendant, [2] the defendant's prior proclivity to substitute counsel, [3] the reasons for the request, [4] the length and stage of the proceedings, and [5] the disruption or delay which might reasonably be expected to follow the granting of such a motion." (*People v. Windham* (1977) 19 Cal.3d 121, 127-128 (*Windham*).) A trial court's ruling denying a *Faretta* motion may be upheld though the court does not address these factors explicitly, if the record supports its conclusion. (*People v. Perez* (1992) 4 Cal.App.4th 893, 904-905.)

Here, the trial court acted within its discretion in denying Lopez's belated request. The jury returned its verdict on July 9, 2012, the trial court set an initial sentencing date for August 24, 2012, with Lopez's express consent, and the hearing was ultimately continued to September 21, 2012. Lopez never in that 10-week period asked to represent himself though he recognized, as he stated at the hearing, that he could not leave to his attorney his request based on ineffective assistance of counsel "[b]ecause . . . I know he's not going to file that [against] himself."

Lopez complains he had no opportunity "to explain why he waited to the date of the sentencing hearing to make his motion." The record shows, however, Lopez registered his disagreement with the trial court's observation that his lawyer's courtroom performance was not ineffective, but he offered no explanation for his late self-representation request or object to the court's finding his motion was untimely. Lopez also suggests the trial court abused its discretion "by relying on its own observations at trial to conclude" the request based on ineffective assistance was unfounded. But as

44

noted he had ample time to make and explain his request in the 10 weeks after the verdict, and the quality of counsel's representation is a relevant factor for the trial court's consideration. (*Windham*, *supra*, 19 Cal.3d at pp. 127-128.)

Postverdict self-representation motions normally do not pose "the potential disruption of proceedings already in progress," but still must be made "within a reasonable time" before sentencing. (*People v. Miller* (2007) 153 Cal.App.4th 1015, 1024.) Here, the court reasonably could conclude under the pertinent *Windham* factors that Lopez's proclivity for filing *Marsden* petitions against both his initial conflict counsel and his trial counsel for unfounded deficiencies indicated his latest motion was another baseless request that would cause unwarranted disruption at the 11th hour of the trial proceedings, merely to delay sentencing. There was no error.

I.      *Defendants' Petty Theft Convictions Must Be Stricken*

The Attorney General concedes Rodriguez's and Lopez's respective petty theft convictions each must be stricken as a lesser-included offense of robbery. A defendant may not be convicted of both the greater crime and a lesser included offense (*People v. Reed* (2006) 38 Cal.4th 1224, 1226-1227), and theft is a lesser-included offense of robbery, which requires the additional element of force or fear. (*People v. Whalen* (2013) 56 Cal.4th 1, 69). We therefore correct the judgment (§ 1260) by striking defendants' petty theft convictions.

J.      *654 Stay on Carjacking and Robbery Convictions and Enhancements*

The Attorney General also concedes the trial court erred in imposing consecutive prison terms for carjacking, robbery, and their attendant firearm enhancements because those sentences instead must be stayed under section 654. Punishment for both felony-murder and the underlying felony is improper (*People v.*

45

*Meredith* (1981) 29 Cal.3d 682, 696), and when sentencing on a substantive offense is stayed, any penalty enhancements attached to that offense also must be stayed. (*People v. Guilford* (1984) 151 Cal.App.3d 406, 411.) We therefore correct the judgment accordingly. (§ 1260.)

K.    *Remand to Order Restitution to the Victim's Family*

Finally, the Attorney General agrees we must set aside the trial court's restitution order obligating Rodriguez and Lopez jointly to pay $21,473.26 to the Wilshire Insurance Company for Ochoa's funeral expenses. Longstanding constitutional and statutory provisions require convicted offenders to pay restitution for economic harm they inflict on their victims. (Cal. Const., art. I, § 28, subd. (b)(13)(B) ["Restitution shall be ordered . . . in every case . . . in which a crime victim suffers a loss"]; § 1202.4, subd. (f) [court must order restitution except in extraordinary circumstances].) Insurers and other third parties who are not direct and immediate victims of the crime are not entitled to restitution. (*People v. Birkett* (1999) 21 Cal.4th 226, 246-248 (*Birkett*); *People v. Martinez* (2005) 36 Cal.4th 384, 391-394; see, e.g., *People v. Busser* (2010) 186 Cal.App.4th 1503, 1509 ["Insurance companies that suffer the consequences of crime only by reimbursing the crime-related losses of their policyholders do not reasonably fall within the definition of direct victims"].)

Distinguishing such third parties, the Legislature has specified a crime victim's surviving family members qualify as "victims" within the meaning of the restitution statute for economic losses they suffer as a result of the crime. (§ 1202.4, subd. (k)(1), (3).) The duty and expense of providing interment services generally falls on those family members (Health & Saf. Code, § 7100) and, similar to the collateral source rule, the fact they or the decedent on behalf of his survivors may have obtained

46

insurance to cover those expenses does not absolve the defendant of his or her restitution obligation. (See *Birkett*, *supra*, 21 Cal.4th at p. 246 [offender entitled to "no windfall from the fortuity that the victim was otherwise reimbursed"].) Consequently, defendants do not object and we agree with the Attorney General that remand is necessary for the trial court to amend its restitution order to specify the $21,473.26 must be paid to Ochoa's surviving next of kin rather than the insurance company.

III

DISPOSITION

We modify and correct the judgment (§ 1260) by striking Lopez's and Rodriguez's petty theft convictions and by entering a stay under section 654 on defendants' carjacking and robbery convictions and enhancements, and we remand the matter for the trial court to amend its restitution order to reflect Rodriguez and Lopez must pay $21,473.26 in funeral expenses to Ochoa's relatives rather than the Wilshire Insurance Company. In all other respects, the judgment is affirmed. The trial court is directed to prepare and forward to the Department of Corrections and Rehabilitation a new abstract of judgment to reflect the corrections made on appeal.


ARONSON, ACTING P. J.

WE CONCUR:


FYBEL, J.


IKOLA, J.


47